**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**MISSOULA DIVISION**

_____

RONAN TELEPHONE COMPANY,
a Montana corporation, and
HOT SPRINGS TELEPHONE COMPANY,          CAUSE NO. CV 06-99-M-DWM

                    Plaintiffs,

          vs.

ALLTEL COMMUNICATIONS, INC.,            FINDINGS & RECOMMENDATION
GOLD CREEK CELLULAR OF MONTANA          OF UNITED STATES
LIMITED PARTNERSHIP, d/b/a              MAGISTRATE JUDGE
VERIZON WIRELESS, VERIZON WIRELESS
(VAW), LLC, WESTERN WIRELESS, LLC,
and WWC PAGING CORPORATION,

                    Defendants.

_____

     Defendants Alltel Communications, Inc., Western Wireless

LLC, and WWC Paging Corp., Gold Creek Cellular of Montana Limited

Partnership, d/b/a Verizon Wireless, and Verizon Wireless, LLC

("Defendants") have moved pursuant to Fed. R. Civ. P. 12(b)(6) to

dismiss portions of the Complaint filed by Plaintiffs Ronan

Telephone Company and Hot Springs Telephone Company

("Plaintiffs") for failure to state a claim upon which relief may

be granted.  Having considered the briefs and materials of

record, the Court enters the following:

## RECOMMENDATION

**IT IS RECOMMENDED** that the Defendants' partial motion to dismiss be **GRANTED IN PART AND DENIED IN PART**.  Specifically, the motion to dismiss should be granted in all respects except to the extent that Defendants move to dismiss the federal portions of Counts 1 through 4, as well as Count 10, on statute of limitations grounds.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendation of the United States Magistrate upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to these findings must be filed with the Clerk of Court and copies served on opposing counsel within ten (10) days after receipt hereof, or objection is waived.

DONE and DATED this 4th day of December, 2006

/s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge

## RATIONALE

## I.   BACKGROUND

Plaintiffs are wireline local exchange carriers ("LECs") that provide local access to end user customers in their local exchange areas.  Second Amended Complaint, ¶ 15 (October 13, 2006).  LECs provide local telephone service to their own wireline customers, and also provide access service to other telecommunications service providers.  Second Am. Compl., ¶ 16.

If such a provider, or carrier, does not have the facilities to complete calls to the wireline customers of an LEC, the carrier can purchase access service, thereby allowing it to transmit calls to end users in the LEC's local exchange area. Second Am. Compl., ¶ 16. Plaintiffs rely on trunk groups, or similar facility connections, to transmit interexchange telecommunications traffic. Second Am. Compl., ¶ 20. Plaintiffs are interconnected with Qwest Communications for purposes of transmitting incoming traffic that originates from outside their local exchange areas. Second Am. Compl., ¶ 20.

Defendants are providers of wireless telecommunications services. Second Am. Compl., ¶ 22. Among the services Defendants provide to their cellular customers is allowing them to call wireline customers located in Plaintiffs' local exchange areas. Second Am. Compl., ¶ 22. To provide that service, Defendants route those calls through Qwest's facilities. Second Am. Compl., ¶ 23. The calls are then delivered by Qwest to Plaintiffs' facilities, and are transmitted via those facilities to Plaintiffs' wireline customers. Second Am. Compl., ¶ 23.

Because Defendants rely on Plaintiffs' facilities and services to complete such calls, Plaintiffs maintain that Defendants are liable for access service charges pursuant to the rates, terms, and conditions set forth in access tariffs on file and approved by the Montana Public Service Commission (PSC) and the Federal Communications Commission (FCC). Second Am. Compl.,

¶ 23-24.  According to Plaintiffs, they have billed Defendants for access services pursuant to those tariffs, but have not received any payment.  Second Am. Compl., ¶ 31. Plaintiffs commenced this action in June 2006, seeking to recover the charges they allege are due from Defendants for services provided by Plaintiffs in the transmission of those calls.  Complaint, ¶¶ 15-31 (June 19, 2006).  Plaintiffs have since amended their Complaint twice.  Amended Complaint (October 3, 2006); Second Amended Complaint (October 13, 2006).

Plaintiffs have asserted claims against the various Defendants in this case for breach of contract, breach of implied contract, unjust enrichment, and unlawful self-help.[1]  Second Am. Compl., ¶¶ 32-109.  Plaintiffs allege in Counts 1 through 4 that their state and federal access tariffs constitute contracts that Defendants have breached by failing to pay access charges.[2] Second Am. Compl., ¶¶ 32-57.  Counts 5 through 8 are breach of implied contract claims, in which Plaintiffs allege that their state and federal access tariffs function as contractual offers to sell access service, which Defendants accepted by continuing to transmit traffic for termination in the Plaintiffs' exchanges after receiving billing invoices.  Second Am. Compl., ¶¶ 58-99.

_____

[1] Plaintiffs also seek attorneys fees pursuant to the terms of their respective state tariffs.  Second Amended Complaint, ¶¶ 110-114.

[2] Counts I through IV all allege breach of contract and are substantively the same, but identify different combinations of the named Plaintiffs and Defendants.

Plaintiffs maintain that Defendants are liable for the contractual value of the telecommunications services provided. Second Am. Compl., ¶¶ 68, 78, 89, 99.  In Count 9, Plaintiffs allege that Defendants have been unjustly enriched because they have routed telecommunications traffic for termination in Plaintiffs' local exchanges without paying Plaintiffs for those services.  Second Am. Compl., ¶¶ 100- 106.  Finally, Plaintiffs assert in Count 10 that Defendants' refusal to pay them pursuant to the terms of the tariffs constitutes unlawful self-help in violation of 47 U.S.C. § 201(b).  Second Am. Compl., ¶ 107-109.

Defendants have now moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss portions of Plaintiffs' Second Amended Complaint for failure to state a claim upon which relief can be granted.[3]  Specifically, Defendants move to dismiss Counts 1-8 to the extent they seek recovery under state and federal tariffs for traffic that originates and terminates within the major trading area (MTA) that includes Montana and neighboring states. Defendants argue that those claims are barred by the doctrine of

---

[3] Defendants originally moved to partially dismiss Plaintiffs' first Complaint.  Defs.' Partial Mot. to Dismiss (July 25, 2006). They have since moved to partially dismiss the Second Amended Complaint, and in doing so have incorporated the arguments asserted in support of their original motion.  Defs.' Partial Mot. to Dismiss Second Amended Complaint (October 16, 2006).  While the Second Amended Complaint is in large part identical to the original Complaint, Plaintiffs have added claims for unjust enrichment and attorneys' fees, and have amended the amount of damages sought in Counts 1-4 based on the passage of time since the commencement of this action.  Plaintiffs have also amended Counts 5-8 to seek recovery from November 1998, rather than April 2005.

collateral estoppel and preempted by federal law.  Defendants
also move to dismiss Counts 5-8 to the extent they seek recovery
for traffic delivered after April 29, 2005, the effective date of
an FCC order requiring that compensation obligations be
established pursuant to statute.  Defendants additionally move to
dismiss Counts 1-4 and Count 10 on statute of limitations grounds
to the extent they seek damages based on applying federal access
tariffs to traffic exchanged more than two years before this suit
was initiated.  Next, Defendants move to dismiss Plaintiffs'
claim for unjust enrichment "because it would permit Plaintiffs
to bypass the federal system for regulating interconnection and
reciprocal compensation between telecommunications carriers."
Defs.' Mot., 3 (Oct. 16, 2006).  Finally, Defendants move to
dismiss Plaintiffs' claim for attorneys fees because the state
tariffs upon which they seek to recover are preempted by federal
law.

## II. LEGAL STANDARD - MOTION TO DISMISS

A complaint should be dismissed pursuant to Rule 12(b)(6)
only if "it appears beyond doubt that the plaintiff can prove no
set of facts in support of his claim which would entitled him to
relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  The court
must accept all allegations of material fact as true, *Hospital
Bldg. Co. v. Rex Hospital Trustees*, 425 U.S. 738, 740 (1976), and
construe the pleading in the light most favorable to the
nonmoving party.  *Tanner v. Heise*, 879 F.2d 572, 576 (9th Cir.

1989).  "However, the court is not required to accept legal conclusions case in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged" and need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004).

In general, the "court may not consider evidence outside the pleadings in connection with a motion to dismiss." *Inlandboatmens Union of Pacific v. Dutra Group*, 279 F.3d 1075, 1083 (9th Cir. 2002).  If the court chooses to consider such evidence, "it must normally convert the 12(b)(6) motion into a Rule 56 motions for summary judgment, and it must give the nonmoving party an opportunity to respond."  *U.S. v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003) (citing Fed. R. Civ. P. 12(b); *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 n. 4 (9th Cir. 1998)*.* There are, however, certain exceptions to this rule.  For example, a court "may take judicial notice of 'matters of public record'" as allowed by Fed. R. Evid. 201. *See*, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)*(quoting Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986)).  The court may also consider documents incorporated by reference into the complaint.  *Ritchie*, 342 F.3d at 908.

Both parties in this case have submitted several documents for this Court's consideration in conjunction with the pending

FINDINGS AND RECOMMENDATION/ Page 7

motion to dismiss.  Specifically, Defendants have submitted a map available on the FCC's website of the fifty-one major trading areas, a chart delineating the various claims set forth in the Complaint, a Memorandum Opinion and Order issued by the Federal Communications Commission ("FCC"), and a Petition for Review of an FCC decision.  With the exception of the chart, which simply summarizes the claims set forth in the first Complaint, this Court may properly take judicial notice of the documents submitted by Defendants.  Plaintiffs have in turn submitted copies of access service tariffs filed with Montana Public Service Commission, along with various court orders.  This Court may properly take judicial notice of those materials as well. *See e.g., Marcus v. AT&T Corp.*, 938 F.Supp. 1158, 1164-65 (S.D.N.Y. 1996) (because tariffs filed with the FCC are public documents, the court may properly consider them on a 12(b)(6) motion to dismiss).

**III.  DISCUSSION**

**A.  State access tariff claims (Counts 1-8)**

Defendants move to dismiss Plaintiffs' various state access tariff claims, which appear in Counts 1-8 of the Second Amended Complaint, on preemption grounds.  Defendants also move to dismiss those claims based on the doctrine of collateral estoppel.  The Court will address each alternative argument in turn.

**1. Preemption**

Plaintiffs seek recovery in Counts 1 though 8 under state access tariffs for intraMTA traffic originated by the Defendants, who are commercial mobile radio service ("CMRS") providers.[4] Plaintiffs allege in Counts 1 through 4 that their state access tariffs constitute express contracts, the rates, terms and conditions of which Defendants breached by failing to compensate Plaintiffs for the service they provided. Second Am. Compl., ¶¶ 32-57. Plaintiffs alternatively allege in Counts 5-8 that their state access tariffs constitute contractual offers to sell service, which Defendants accepted by continuing to transmit traffic to Plaintiffs for termination even after receiving billing invoices, thereby establishing enforceable implied-in-fact contracts. Second Am. Compl., ¶¶ 58-99. Plaintiffs allege that Defendants breached their obligations under those implied-in-fact contracts by refusing to pay for the service they received. Second Am. Compl., ¶¶ 58-99.

Defendants have moved to dismiss Plaintiffs' breach of express and implied contract claims to the extent they seek recovery under state access tariffs for CMRS traffic that

---

[4] Plaintiff Ronan Telephone Company's ("RTC") state access tariff, which applies to intrastate service, is RTC Montana Public Service Commission No. 2, Access Service Tariff." Pls.' Response, Exh. A (Sept. 8, 2006). Plaintiff Hot Springs Telephone Company's ("HSTC") state access tariff, which also applies to intrastate service, is "HSTC Montana Public Service Commission No. 2, Access Service Tariff." Pls.' Response, Exh. B.

originates and terminates with a single MTA.[5]  Defendants
maintain that federal law impliedly preempts Plaintiffs' claims
to the extent they seek to recover under those state tariffs.

In 1993, Congress amended the Communications Act of 1934, 47
U.S.C. §§ 151, et. seq., to provide for the uniform and
comprehensive regulation of CMRS providers such as the
Defendants.  *See*, Omnibus Budget Reconciliation Act of 1993, Pub.
L. No. 103-66, Title VI, §6002, 107 Stat. 312, 387-02 (1993).
Congress has also bestowed upon the FCC "the authority to
'execute and enforce' the Communications Act, and to 'prescribe
such rules and regulations as may be necessary in the public
interest to carry out the provisions' of the Act." *National
Cable & Telecommunications Ass'n v. Brand X Internet Services et
al.*, 545 U.S. 967, 125 S.Ct. 2688, 2700 (2005) (*quoting* 47 U.S.C.
§§ 151, 201(b); *At&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366,
377-78, 119 S.Ct. (1999)).  With the subsequent
Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56
(1996) (codified at 47 U.S.C. § 151 *et seq.*), Congress "opened
the previously monopolized telecommunications industry to
competition." *Atlas Telephone Co. v. Oklahoma Corp. Com'n.*, 400
F.3d 1256, 1259-60 (10th Cir. 2005).

---

[5] Because all of Montana is located within MTA 42, Plaintiffs'
state access tariff claims are for intraMTA traffic.  Defs.' Br. in
Support, Exh. C.

Among its many provisions, the 1996 Act establishes an obligation on the part of each telecommunication carrier "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers."  47 U.S.C. § 251(a)(1).  The Act also imposes a duty on each LEC "to establish reciprocal compensation arrangements for the transport and termination of telecommunications."[6]  47 U.S.C. § 251(b)(5).  Section 252 of the 1996 Act governs implementation of these and other obligations imposed by Section 251.  *See, Covad Communications Co. v. Bellsouth Corp.*, 314 F.3d 1282, 1284 (11th Cir. 2002).  Section 252 directs that carriers first address the terms to govern the exchange of traffic by way of voluntary negotiations.  47 U.S.C. § 252(a).  Carriers must submit their negotiated agreements to the appropriate state public utilities commission for approval.  47 U.S.C. § 252(a),(e).  If the carriers are unable to agree on all items, they may petition the state commission to arbitrate any open issues.  47 U.S.C. § 252(b)(1).

Congress tasked the FCC with adopting "regulations to implement the Act, including its reciprocal compensation provisions."  *SBC Inc. v. Federal Communications Com'n.*, 414 F.3d

---

[6] Federal regulations define "a reciprocal compensation arrangement between two carriers [as] one in which each of the two carriers receives compensation from the other carrier for the transport and termination on each carrier's network facilities of telecommunications traffic that originates on the network facilities of the other carrier."  47 C.F.R. § 51.701(e).

486, 490 (3rd Cir. 2005) (*citing AT&T Corp. v. Iowa Utilities Board.*, 525 U.S. 366, 377-78 (1999)).  To fulfill that obligation, the FCC released its *First Report and Order* in August 1996.  *In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, 11 FCCR 15499, 11 FCC Rcd 15499, FCC 96-325 (1996) ("*First Report and Order*").  While the FCC "declin[ed] to treat CMRS providers as LECs, and thus subject to the obligations imposed under §§ 251(b)-(c)," it "expressly determined that LECs are obligated under § 251(b)(5) to enter into reciprocal compensation arrangements with CMRS providers." *Atlas Telephone Co.*, 400 F.3d at 1263 (*citing First Report and Order,* ¶¶ 1006, 1008).  The FCC explained that those "reciprocal compensation obligations should apply only to traffic that originates and terminates within a local area," which it defined as consisting of the MTA for purposes of traffic exchanged between CMRS providers and LECs.  *First Report and Order*, ¶¶ 1034, 1036.  With regard to the applicability of state and federal access charge mechanisms, such as tariffs, for such traffic, the FCC specifically stated as follows:

> traffic to or from a CMRS network that originates and terminates within the same MTA is subject to transport and termination rates under section 251(b)(5), *rather than interstate and intrastate access charges.*

*First Report and Order*, ¶ 1036 (emphasis added).

Because the FCC has made clear that intraMTA traffic between a CMRS provider and LEC is subject to reciprocal compensation,

not state or federal access charges, Defendants maintain that
Plaintiffs' claims are preempted to the extent they seek recovery
under their state access tariffs for intraMTA traffic originated
by CMRS providers.

It is well-established that, under the Supremacy Clause,
U.S. Const. Art. VI, cl.2, federal law can preempt state law by
way of express preemption, field preemption, or conflict
preemption. *Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003).
Here, Defendants argue that the FCC's *First Order and Report*
displaces state law by way of implied conflict preemption.
Conflict preemption exists if "there is an 'actual conflict'
between federal and state law" such that "compliance with both
federal and state regulations is a physical impossibility."
*Ting*, 319 F.3d at 1136 (*quoting Florida Lime & Avocado Growers,
Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)).  Because the FCC has
specifically directed that state access charges do not apply to
intraMTA traffic originated by CMRS providers, Defendants
maintain that "[e]nforcing the terms of state access tariffs to
intra MTA traffic would directly conflict with the FCC's
implementation order, impeding the federal objectives set by the
1996 Act."  Defs.' Br. in Support, 13 (July
25, 2006).

For support, Defendants point first to the "3 Rivers
Litigation," which began seven years ago in the Great Falls
Division of this Court.  *3 Rivers Telephone Cooperative Inc., et*

FINDINGS AND RECOMMENDATION/ Page 13

*al. v. U.S. West Communications, Inc.*, 125 F.Supp.2d 417 (D. Mont. 2000) (*3 Rivers I*), *rev'd,* 45 Fed.Appx. 698 (9th Cir. 2002) (unpublished).  In that case, nine Montana rural telephone companies, including RTC and HSTC, brought suit against U.S. West, now known as Qwest, to recover terminating access charges for intraMTA telecommunications traffic under intrastate tariffs. *3 Rivers I*, at 418-419.  Citing the FCC's *First Report and Order*, the District Court summarily dismissed those claims related to traffic originating with wireless carriers because "no local exchange carrier...may levy access charges against wireless carriers...."  *3 Rivers I*, 125 F.Supp.2d at 418.  Plaintiffs appealed, and the Ninth Circuit reversed on the basis that the lower court should have evaluated the terms of the tariffs at issue. *3 Rivers Telephone Cooperative Inc.*, 45 Fed.Appx. 698, 699.  The district court thus examined the tariffs on remand, and found that they indeed made Qwest liable for terminating access charges for all traffic transported to the plaintiffs.  *3 Rivers Telephone Cooperative Inc., et al. v. U.S. West Communications, Inc.*, 2003 WL 24249671, *12 (D. Mont. 2003) (*3 Rivers II*).

The court did not end its analysis there, however, turning next to the question of federal preemption.  According to Qwest, even if it was "liable under the tariffs for terminating access charges on traffic originated by other carriers," it could not "be held liable for such charges related to intra-MTA wireless traffic" delivered to plaintiffs for termination.  *3 Rivers II*,

FINDINGS AND RECOMMENDATION/ Page 14

2003 WL 24249671, *12.  Qwest maintained that federal law impliedly preempted any such state law claims because allowing the plaintiffs to recover "terminating access charges on intraMTA wireless traffic transiting Qwest's facilities would directly thwart the FCC prohibition against assessing access charges on intraMTA wireless traffic."  *3 Rivers II*, 2003 WL 24249671, *12.

The court agreed, holding that "47 U.S.C. § 251(b), as implemented by the FCC's [*First Report & Order*], preempts the tariffs in [that] case to the extent that the reciprocal compensation scheme applies to CMRS traffic that originates and terminates in the same MTA, regardless of whether it flows over the facilities of other carriers along the way to termination." *3 Rivers II*, 2003 WL 24249671, 18.  Consistent with this determination, several other courts have similarly concluded that state access charges do not apply to intraMTA wireless traffic. *See e.g.*, *Iowa Network Servs., Inc. v. Qwest Corp.*, 466 F.3d 1091, 1096-97 (8th Cir. 2006); *Alma Telephone Co. v. Pub. Serv. Comm'n of Mo.*, 183 S.W.3d 575, 578 (Mo. 2006) (concluding that the FCC's *First Report and Order* precludes application of "tariffs pertaining to interstate and intrastate access charges").

Here, as in *3 Rivers II*, Plaintiffs are LECs seeking to recover access charges for intraMTA traffic originating with CMRS providers.  As the *3 Rivers II* court correctly recognized, however, the 1996 Act requires that LECs "establish reciprocal

FINDINGS AND RECOMMENDATION/ Page 15

compensation arrangements for the transport and termination of telecommunications."  47 U.S.C. § 251(b)(5); *3 Rivers II*, * 15. Moreover, in implementing that provision, the FCC has specifically stated that "traffic to or from a CMRS network that originates and terminates within the same MTA is subject to transport and termination rates under section 251(b)(5), rather than interstate and intrastate access charges." *First Report and Order*, ¶ 1036.  Despite the FCC's proclamation, Plaintiffs in this case are seeking to recover access charges for intraMTA traffic initiated by CMRS providers.  Complaint, ¶¶ 32-95.  But Plaintiffs cannot recover access charges for such traffic without directly contravening the FCC's implementing directive.

Plaintiffs nevertheless argue that Section 251(b)(5)'s reciprocal compensation obligations, as implemented by the FCC's *First Report and Order*, do not preempt their state access tariff claims for a number of reasons.  First, they maintain that "[t]he FCC lacks jurisdiction over intrastate services, and therefore lacks the legal authority to preempt Montana state tariffs." Pls.' Response, 5 (Sept. 8, 2006).  To support this sweeping assertion, Plaintiffs cite without explanation to 47 U.S.C. §§ 152(b), 201(a) and 203(a).  Pls.' Br. in Response, 5 (Sept. 8, 2006).  While section 152(b) identifies certain matters that do not fall within the FCC's jurisdiction, it does so "except as provided in...section 332 of this title."  47 U.S.C. § 152(b). As Defendants note, Section 332 provides the FCC with the

authority to regulate commercial mobile services as common carrier services, and to regulate wireless interconnection matters. *See,* 47 U.S.C. §§ 332(c)(1)(A)&(B).

Despite this authority, Plaintiffs argue that the express preemption provisions of Section 332(c)(3) establish that the FCC lacks jurisdiction over intrastate communications. That section provides, in pertinent part, that "no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services." 47 U.S.C. § 443(c)(3). Section 332(c)(3) does not expressly preempt states from imposing access charges. States may presumably regulate other "terms and conditions " of CMRS services so long that such regulation is otherwise consistent with federal law. That is the question here – whether the FCC has displaced state access charges, not by way of express preemption, but by way of implied conflict preemption.

Moreover, as Defendants note, courts have long accepted the FCC's jurisdiction and authority to regulate intrastate wireless traffic. *See e.g., Iowa Utils. Bd. v. FCC*, 120 F.3d 753, 800 n 21 (8th Cir. 1997), *aff'd in part and rev'd in part*, *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999). Sections 251-252 of the 1996 Act also provide the FCC with the authority to regulate intrastate wireless traffic. *See*, *AT&T Corp. v. Iowa Utils. Bd.*,

525 U.S. 366, 378-80 (recognizing that the FCC has the jurisdiction and authority to implement the provisions of the 1996 Act, including Sections 251 and 252, which apply to intrastate matters).

Plaintiffs also cite 47 U.S.C. §§ 201(a) and 203(a) for the proposition that the FCC lacks jurisdiction to regulate intrastate wireless traffic.  But they fail how to explain how these sections would deprive the FCC of its well settled authority "to make rules governing matters to which the 1996 Act applies."  *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. at 380.  For these reasons, this Court rejects Plaintiffs' argument on this point, and concludes that the FCC has the jurisdiction to regulate the intrastate wireless traffic at issue in this litigation.

Assuming the FCC has such jurisdiction, Plaintiffs argue that the FCC's *First Report and Order* does not in any event preempt their state access tariffs for a number of reasons. First, they maintain that the *First Report and Order* in fact provides that access charges remain applicable, and the filed tariff doctrine thus controls.[7]  Pls.' Response, 6 (Sept. 8,

_____

[7]  Under the filed tariff doctrine, tariffs filed with and approved by the appropriate regulatory agency have the force of law and "'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer."  *Davel Communications Inc. v. Qwest Corp.*, 460 F.3d 1075, 1084 (9th Cir. 2006)(*quoting Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000).  Because filed tariffs "have the force and effect of state law, [they] are subject to potential preemption by federal law if

2006).  For support, they rely primarily on the final sentence of

paragraph 1043, in which the FCC states that:

> [b]ased on [its] authority under section 251(g) to preserve
> the current interstate access charge regime, we conclude
> that the new transport and termination rules should be
> applied to LECs and CMRS providers so that CMRS providers
> continue not to pay interstate access charges for traffic
> that currently is not subject to such charges, and are
> assessed such charged for traffic that is currently subject
> to interstate access charges.
>
> *First Report and Order*, ¶ 1043.

Plaintiffs maintain that the FCC thus clarified that

tariffed access charges remain applicable, and point to Section

251(g) of the 1996 Act to support their interpretation.  Section

251(g) provides, in pertinent part, that to the extent an LEC

provides wireline services, it shall provide "access to

interexchange carriers and information service providers in

accordance with the same equal access and nondiscriminatory

interconnection restrictions and obligations (including receipt

of compensation) that" applied before the 1996 Act, "until such

restrictions and obligations are explicitly superseded by" FCC

regulations.  47 U.S.C. § 251(g).  Plaintiffs argue that Congress

thus preserved existing access charge arrangements, such as their

state and federal tariffs, unless explicitly superceded by the

FCC.

This Court is not convinced.  Significantly, the *3 Rivers II*

court rejected this very argument, noting that "[t]he referenced

---

the criteria for preemption are present." *3 Rivers II,* 2003 WL
24249671, *13.

language in the last sentence of paragraph 1043 pertains to 'interstate access charges' and does not specifically reference 'local' calls," which are the only type of calls at issue here. As explained above, all of the CMRS-LEC traffic at issue on Defendants' motion is considered local, rather than long-distance, because it originates and terminates within the same MTA. Moreover, as the *3 Rivers II* court noted, the FCC specifically reiterated earlier in paragraph 1043 "that traffic between an incumbent LEC and a CMRS network that originates and terminates within the same MTA (defined by the parties' locations at the beginning of the call) is subject to transport and termination rates under section 251(b)(5), rather than interstate or intrastate access charges."

Plaintiffs also rely on Section 251(d)(3) for the proposition that the FCC has not preempted state access tariffs. That section reads as follows:

> (3) Preservation of State access regulations.  In prescribing and enforcing regulations to implement the requirements of this section, the [FCC] shall not preclude the enforcement of any regulation, order, or policy of a State commission that...
> (A) establishes access and interconnection obligations of local exchange carriers;
> (B) is consistent with the requirements of this section; and
> (C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.

While this section does not preclude state commissions from enforcing regulations, orders, or policies establishing access obligations of LECs, those regulations, orders, or policies must otherwise be "consistent with the requirements" of Section 251,

including its reciprocal compensation requirements.  Furthermore, the states cannot "substantially prevent implementation of the requirements" of Section 251, again including its reciprocal compensation requirements.  As explained above, the FCC has stated that intraMTA traffic originating with a CMRS provider is subject to the reciprocal compensation requirements of Section 251(b)(5), "rather than interstate and intrastate access charges."  *First Report and Order*, ¶ 1036.

Plaintiffs also contend that Defendants' preemption argument "actually conflicts with federal law," because the 1996 Act and its implementing regulations require reciprocal compensation arrangements only where two carriers' networks are directly connected.  Pls.' Response, 7 (citing 47 U.S.C. § 252(d)(2)(A)(I); 47 C.F.R. §§ 51.5 & 51.701(e)).  The parties in this case are not directly connected because Defendants transmit the traffic at issue through Qwest's facilities for ultimate delivery to Plaintiffs' wireline customers.  Second Am. Compl., ¶ 23.  According to Plaintiffs, this means that they need not comply with Section 251's reciprocal compensation obligations.

Plaintiffs fail to cite any supporting caselaw, however, and as Defendants note, at least two circuit courts have held to the contrary, concluding that the 1996 Act's Section 251 obligations apply even when the parties are not directly connected.  *See e.g., WWC License, L.L.C. v. Boyle*, 459 F.3d 880, 892 (8th Cir. 2006); *Atlas Tel. Co. v. Oklahoma Corp. Comm'n*, 400 F.3d 1256,

1265-68 (10th Cir. 2005) (holding that LEC's obligation to
establish reciprocal compensation arrangements with CMRS provider
is "not impacted by the presence or absence of a direct
connection").

Plaintiffs next take the position that they are exempt from
the 1996 Act's reciprocal compensation obligations because they
qualify as "rural telephone companies."  Pls.' Response, 8.  For
support, Plaintiffs point to Section 251(f)(1), which exempts
certain rural telephone companies from the obligations set forth
in Section 251(c).  But it is Section 251(b), not Section 251(c),
that requires LECs to establish reciprocal compensation
arrangements.  47 U.S.C. § 251(b)(5).  The fact that Section
251(f)(1) exempts certain rural telephone companies from the
additional obligations imposed by Section 251(c) does nothing to
relieve Plaintiffs of their reciprocal compensation obligations
under Section 251(b)(5).  Moreover, as Defendants note, many of
the principal cases addressing application of access charges to
CMRS traffic involve rural LECs.  *See e.g.*, *3 Rivers II*, 2003 WL
24249671; *Alma Tel. Co.*, 183 S.W.3d 575; *Union Tel.,* 2004 WL
4960780; *Northern Ark. Tel. Co.,* 2006 WL 2547400.

Finally, Plaintiffs argue that the FCC has since indicated
that its *First Report and Order* had no preemptive effect on state
tariffs.  Pls.' Response, 9.  Specifically, they cite a
Declaratory Ruling Report and Order issued by the FCC in 2005, in
which the FCC stated that "[b]ecause the existing rules do not

FINDINGS AND RECOMMENDATION/ Page 22

explicitly preclude tariffed compensation arrangements, we find
that incumbent LECs were not prohibited from filing state
termination tariffs and CMRS providers were obligated to accept
the terms of applicable state tariffs." *In the Matter of*
*Developing a Unified Intercarrier Compensation Regime*, 20
F.C.C.R. 4855, ¶ 9 (2005) ("*T-Mobile Order*"); Pls.' Response, 9,
11.

Plaintiffs' reliance on the *T-Mobile Order* is misplaced.
While the FCC determined that "it would not have been unlawful
for incumbent LECs to assess transport and termination charges
based upon a state tariff," any such tariff must be "otherwise
applicable" to the traffic at issue. *T-Mobile Order*, ¶¶ 10, 12.
*See, Alma Tel. Co. v. Pub. Serv. Comm'n of Mo.*, 183 S.W.3d 575,
577-78 (Mo. 2006). In *Alma Tel. Co.*, LECs sought to recover
compensation for delivering calls originating from CMRS providers
and terminating in the LECs local exchanges. *Alma Tel. Co.*, 183
S.W.3d at 576. In the absence of any reciprocal compensation
arrangements, and because the "CMRS providers continued to
transmit wireless originated traffic to the LECS," the LECs
sought compensation under their existing access tariffs. *Alma*
*Tel. Co.*, 183 S.W.3d at 576-77. The CMRS providers refused to
pay on the basis that the access tariffs did not apply to
wireless originated traffic. *Alma Tel. Co.*, 183 S.W.3d at 577.
The LECs then sought to amend their access tariffs "to clarify

the tariffs' applicability to wireless originated traffic." *Alma Tel. Co.*, 183 S.W.3d at 577.

The Missouri Supreme Court upheld the public service commission's determination that the proposed tariffs were unlawful based in large part on the FCC's *T-Mobile Order*. *Alma Tel. Co.*, 183 S.W.3d at 577-78. As that court recognized, the FCC's *T-Mobile Order* "confirmed that in the absence of a reciprocal compensation arrangement, 'CMRS providers accept the terms of otherwise applicable state tariffs.'" *Alma Tel. Co.*, 183 S.W.3d at 577 (*quoting T-Mobile Order*, ¶ 12). As the court explained, however, [t]he access tariffs that the LECs" sought were "not 'otherwise applicable state tariffs.'" *Alma Tel. Co.*, 183 S.W.3d at 578. The court found "[t]hat question was settled" by the FCC's *First Report and Order*, in which the FCC distinguished "between transport and termination tariffs, which are applicable to local traffic, and access tariffs, which are applicable to long-distance traffic." *Alma Tel. Co.*, 183 S.W.3d at 578. As the court noted, the FCC characterized wireless calls within the same MTA as local traffic, and concluded that "traffic to or from a CMRS network that originates and terminates within the same MTA is subject to transport and termination rates under section 251(b)(5), rather than interstate and intrastate access charges." *Alma Tel. Co.*, 183 S.W.3d at 578 (*citing First Report and Order*, ¶ 1036). On that basis, and because the parties in that case all agreed "that the traffic in question originates and

FINDINGS AND RECOMMENDATION/ Page 24

terminates within the same MTA," the court concluded that "only
tariffs pertaining to transport and termination rates may be
imposed, and conversely, tariffs pertaining to interstate and
intrastate access charges may not be imposed." *Alma Tel. Co.*,
183 S.W.3d at 578.  The court determined that the public service
commission properly disallowed the proposed tariffs, which the
LECs conceded were interstate and intrastate access charges.

Here, as in *Alma Tel. Co.*, the LECs are seeking to recover
under state access tariffs, not wireless termination tariffs.
Plaintiffs specifically allege in their Complaint that "[b]y
transmitting calls for completion by Plaintiffs, the Defendants
have purchased Plaintiffs' interstate and intrastate access
services."  Second Amended Complaint, ¶ 30.  They claim that by
"completing the calls received from Defendants, Plaintiffs have
provided telecommunications services to Defendants, namely,
interstate and intrastate access service."  Second Amended
Complaint, ¶ 30.  Nowhere do Plaintiffs argue or allege that
their state access tariffs are in fact termination tariffs.[8]

_____

[8] Plaintiffs' Second Amended Complaint does, however, describe
those tariffs somewhat differently than did their original
Complaint.  For example, rather than referencing Plaintiffs'
"access tariffs" as did the original Complaint, the Second Amended
Complaint simply refers in many places to Plaintiffs' "tariffs."
Complaint, ¶¶ 30, 31; Second Amended Complaint, ¶¶ 30, 31.  In
their brief in support of their second motion to dismiss,
Defendants resisted Plaintiffs' apparent attempts to recharacterize
their access tariffs as wireless termination tariffs.  Nowhere in
Plaintiffs' subsequent response do they take the position that
Defendants anticipated they might, and assert that their access
tariffs are in fact termination tariffs.  Plaintiffs have
effectively waived any such argument by failing to present it in

To the extent Plaintiffs seek to recover under their state access tariffs for intraMTA traffic, they are precluded from doing so by the terms of the 1996 Act and the FCC's implementing orders.

In a final attempt to demonstrate that their state access tariffs are not preempted, Plaintiffs point to the recent case of *Verizon Wireless LLC v. Sahr*, ___ F.Supp.2d ___, 2006 WL 2946594 (D.S.D. Oct. 13, 2006).  In that case, CMRS providers argued on summary judgment that the FCC's implementing regulations and orders preempted state legislation allowing LECs to bill CMRS providers under state access tariffs for intraMTA traffic under certain circumstances.  South Dakota's legislature passed the statutes at issue in that case to address "the technical difficulties that carriers face in classifying traffic," and to deal with the problem of "phantom traffic," which means those "calls that lack sufficient signaling information to enable intermediate and terminating providers to properly bill the originating provider for intercarrier compensation."  *Id.* at * 9. The court recognized that intraMTA traffic is subject to reciprocal compensation and that interMTA traffic is subject to access compensation, but noted the dispute before it was "about the difficulty carriers face in classifying traffic due to the rise of phantom traffic and other technical issues."  *Id.* at *9. "To be properly billed as reciprocal or access, traffic needs to be classified either as intrastate or interstate, and then as

opposition to the pending motion.

either intraMTA or interMTA."  *Id.* at *10.  The statute at issue
"require[s] originating carriers to identify all their traffic
with accurate and verifiable information."  *Id.* at *11.  If the
originating carriers fail to provide that information, "the
terminating LEC may bill the traffic as non-local, which is
billed at the higher access rate."  *Id.* at *11.  Because the
statute thereby authorized "LECs to impose obligations on
traffic, which should not be subject to access charges," the
CMRS providers argued it was preempted by the FCC's implementing
regulations and orders.  *Id.* at *12.

The court recognized that the statutes at issue might well
be preempted, and recognized that "[a]bsent an interconnection
agreement or a request for an agreement, LECs cannot bill for
call termination."  The court nevertheless found there existed a
material issue of fact as to whether technology had since been
developed that would allow for proper traffic identification and
could be implemented without unduly burdening CMRS providers.
The court explained that the "statutory provisions would be
preempted by federal law if they unduly burden competition in
contravention of the 1996 Act."  *Id.* at *13.

The court also rejected the CMRS providers' argument on
summary judgment that federal law preempted the statute at issue
on the basis that it "authorize[d] LECS to charge access rates
for CMRS calls that originate and terminate in the same MTA."
But it did so only after concluding that the statute "does not

necessarily disturb" the rule that calls originating and terminating within the same MTA are subject to reciprocal compensation under Section 251(b)(5) instead of access rates." *Id.* at * 14.  The court concluded that the statute simply "requires an originating carrier to provide accurate and verifiable information to a terminating LEC in order that the terminating LEC can properly classify the traffic as either reciprocal or access and bill accordingly."  *Id.* at *14.  Because the statute did "not necessarily disturb the MTA rule," the court concluded on summary judgment that the FCC's implementing regulations and orders did "not necessarily preempt" the statute. *Id.* at *14.  In so concluding, the court implicitly recognized that the reverse would likewise be true – were a statute to disturb the MTA rule, it would be preempted.

Here, unlike the statute at issue in *Sahr*, imposing access charges pursuant to state tariffs for traffic that is unmistakably intraMTA would most certainly disturb the rule that calls originating and terminating within the same MTA are subject to reciprocal compensation under § 251(b)(5) instead of access charges.  As such, they are preempted by the FCC's implementing regulations and orders.

Because it is impossible for Plaintiffs' state access tariffs to apply at the same time that federal law precludes their effect, this Court concludes that 47 U.S.C. § 251(b), as implemented by the FCC, impliedly preempts Plaintiffs' breach of

express and implied contract claims to the extent they seek to
recover under their state access tariffs for intraMTA wireless
traffic originating with Defendants.

### 2. Collateral estoppel

Defendants argue in the alternative that Plaintiffs are
collaterally estopped from pursuing their breach of tariff and
implied contract claims to the extent they seek to recover under
their state access tariffs for intraMTA traffic.  Having already
concluded that federal law impliedly preempts those claims,
however, this Court need not determine whether Plaintiffs are
collateral estopped from pursuing them as well.

### B.  Federal access tariff claims (Counts 1-4)

Defendants also move to dismiss Plaintiffs' breach of
contract claims to the extent they seek to recover under their
federal access tariffs for interstate, intraMTA traffic.[9]  The
applicable MTA includes all of Montana and portions of Wyoming,
Idaho, Oregon, and Washington.  Defs' Br. in Support, Exh C.
Some of the interstate traffic for which Plaintiffs seek to
recover thus originates and terminates within the same MTA.
Second Amended Complaint, ¶¶ 33, 39, 45, 52.  Defendants maintain
that Plaintiffs cannot recover for such traffic under their

---

[9] RTC's federal access tariff, which applies to interstate
service, is "ICORE FCC Tariff No. 2, Access Service."  Second
Amended Complaint, ¶ 25.  For interstate services provided before
August 2001, the RTC's federal access tariff was "ICORE FCC Tariff
No. 1, Access Service."  Second Amended Complaint, ¶ 25.  HSTC's
federal access tariff, which also applies to interstate service, is
"NECA FCC Tariff No. 5."

federal tariffs for same reasons they believe relief is unavailable under Plaintiffs' state tariffs.

To the extent Plaintiffs' claims rest on federal law, they are not subject to a preemption analysis per se. Rather, the appropriate inquiry is simply whether the 1996 Act and the FCC's implementing decisions allow Plaintiffs to recover under their tariffs. While the parties have submitted copies of Plaintiffs' state tariffs for this Court's review, their federal tariffs are not part of the record now before the Court. Because the Court cannot review those tariffs to determine whether they are in fact access tariffs, or wireless termination tariffs pursuant to which some recovery might be available under the *T-Mobile Order*, it must rely solely on the allegations in the Second Amended Complaint in evaluating Defendants' motion to dismiss. Plaintiffs specifically allege that they "have 'Access Tariffs' on file and approved by the...Federal Communications Commissioner (FCC)...." Second Am. Compl., ¶24.

Assuming, as this Court must for purposes of Defendants' motion to dismiss, that the federal tariffs are in fact "access tariffs" as Plaintiffs allege, Plaintiffs cannot recover under those tariffs for the same reasons they cannot recover under their state access tariffs. Accordingly, to the extent Defendants move to dismiss Plaintiffs federal tariff claims, as set forth in Counts 1-4 of the Second Amended Complaint, their motion should be granted.

FINDINGS AND RECOMMENDATION/ Page 30

**C.   Unjust enrichment**

Plaintiffs have amended their complaint to include a claim for unjust enrichment.  Second Am. Compl., ¶¶ 100-106.  They allege that "Defendants have been unjustly enriched as a result of their unilateral decision to route telecommunications traffic to Plaintiffs via Qwest trunk groups for termination in Plaintiffs' local exchanges."  Second Am. Compl, ¶ 101.  According to Plaintiffs, "[t]his unlawful and unilateral action has resulted in Plaintiffs providing terminating services to Defendants for which Plaintiffs have received no compensation."  Second Am. Compl., ¶ 101.  Plaintiffs maintain that "Defendants have benefitted from" those services, and allege they are entitled to recover under this alternative, equitable theory in the event they cannot recover under their breach of contract or implied contract claims.  Second Am. Compl., ¶¶ 103, 105.

Defendants move to dismiss Plaintiffs' unjust enrichment claim on the basis that "it would permit Plaintiffs to bypass the federal system for regulating interconnection and reciprocal compensation between telecommunications carriers."  Partial Mot. to Dismiss, 3 (Oct. 16, 2006).  For support, they point to several cases in which courts have rejected equitable claims asserted by rural telephone companies, such as the Plaintiffs, in an attempt to establish compensation obligations for traffic sent by CMRS providers.  *See, Iowa Network Servs.,* 385 F.Supp.2d at 909 (dismissing unjust enrichment claim "because resort to equity

FINDINGS AND RECOMMENDATION/ Page 31

is improper where there is a regulatory scheme" in place to resolve the issues), *aff'd* 466 F.3d 1091; *Union Tel. Co.* v. *Qwest Corp.,* 2004 WL 4960780, *11 (D. Wyo. 2004)(concluding that "claims under state law for equitable relief that would permit carriers to bypass and ignore federal regulatory requirements are preempted")(*citing Verizon North, Inc. v. Strand*, 309 F.3d 935, 944 (6th Cir. 2002); *Bastien v. AT&T Wireless*, 205 F.3d 983, 987 (7th Cir. 2000)); *Northern Ark. Tel. Co. v. Cingular Wireless, LLC*, 2006 WL 2547400, *2 (W.D. Ark. 2006) (noting that the 1996 Act governs the "obligation of the parties regarding intercarrier compensation" and concluding that plaintiffs could not rely on equitable state law claims to bypass the Act's negotiation and arbitration requirements).

Accordingly, Plaintiffs in this case cannot pursue an equitable claim for unjust enrichment if that claim is in reality nothing more an attempt on their part to bypass the requirements of the existing federal regulatory scheme. As discussed at length above, there is indeed a comprehensive regulatory scheme pursuant to which LECs and CMRS providers must negotiate and arbitrate to establish reciprocal compensation arrangements. But a significant gap in that scheme existed prior to the effective date of the *T-Mobile Order*. As the FCC explained there, because the 1996 Act did not authorize LECs to "require CMRS providers to negotiate interconnection agreements or submit to arbitration," those LECs might go without compensation for terminating traffic

FINDINGS AND RECOMMENDATION/ Page 32

if the CMRS provider did not seek an agreement for reciprocal compensation. *T-Mobile Order*, ¶ 15.  Aware "that LECs may have had difficulty obtaining compensation from CMRS providers because LECS [could] not require CMRS providers to negotiate interconnection agreements or submit to arbitration under section 252 of the Act," the FCC prospectively amended its rules "to clarify that an incumbent LEC may request interconnection from a CMRS provider and invoke the negotiation and arbitration procedures set forth in section 252 of the Act." *T-Mobile Order*, ¶ 16.  The FCC concluded that "[b]y routing traffic to LECs in the absence of a request to establish reciprocal or mutual compensation, CMRS providers accept the terms of otherwise applicable state tariffs."[10] *T-Mobile Order*, ¶ 12.  The FCC clearly stated that under its amended rules, however, "in the absence of a request for an interconnection agreement, no compensation is owed for termination."  *T-Mobile Order*, ¶ 14 n. 57.

Whether Plaintiffs have invoked the Act's negotiation and arbitration procedures at any time after the effective date of the *T-Mobile Order* is unclear from the face of the Second Amended Complaint.  Likewise, whether Defendants ever invoked the Act's negotiation and arbitration procedures and attempted to establish a reciprocal compensation arrangement with Plaintiffs is also

---

[10] As explained above, access tariffs are not "otherwise applicable state tariffs."

unclear.  Regardless, it is clear that a regulatory scheme
pursuant to which Plaintiffs could have sought interconnection
agreements with Defendants has been in place since the April 29,
2005, effective date of the *T-Mobile Order*.  Allowing Plaintiffs
to pursue a claim for unjust enrichment for traffic delivered
after that date would be to improperly permit them to bypass the
regulatory requirements now in place.  Plaintiffs' claim for
unjust enrichment as it applies to traffic delivered after April
29, 2005, should thus be denied.

At issue then is whether Plaintiffs can pursue their claim
for unjust enrichment with regard to traffic terminated between
November 1998 and April 2005.  As Defendants note, "[f]or a
contract to be implied at law on the basis of unjust enrichment
the plaintiff must show some element of misconduct or fault of
some sort on the part of the defendant, or that he was in some
way taken advantage of."  *Brown v. Thornton*, 432 P.2d 386, 390
(Mont. 1967).

Plaintiffs allege Defendants took advantage of them by
unilaterally deciding to route telecommunications traffic to
their networks for termination without compensating them for the
services provided.  Second Am. Compl., ¶¶ 101-106.  Defendants
challenge the equitable basis of Plaintiffs' claim, pointing out
that while Plaintiffs might not have been able to seek
interconnection agreements before the date of the *T-Mobile Order*,
they could have filed wireless termination tariffs and sought

recovery pursuant to those tariffs.  Defendants argue that
Plaintiffs should not be permitted to recover in equity because
they had another remedy available to them, but chose instead to
rely on their existing access tariffs.

As Defendant point out,  Plaintiffs could have done as many
other LECs apparently did before the *T-Mobile Order* and filed
wireless termination tariffs.  The FCC recognized in the *T-Mobile
Order* that many LECS seeking compensation for terminating such
traffic had in fact "filed wireless termination tariffs with
state commissions in an attempt to be compensated for traffic
that originates with CMRS providers."  *T-Mobile Order*, ¶ 7.  The
FCC observed that, by their terms, those wireless termination
tariffs typically applied "only in situations where there [was]
no interconnection agreement or reciprocal compensation
arrangement between the parties."  *T-Mobile Order*, ¶ 7.  Had the
LECs in this case filed wireless termination tariffs, they would
not be in the unfortunate position they now find themselves.
Because the Plaintiffs had a viable, alternate remedy available
to them but simply failed to use it, they cannot now recover
under the equitable theory of unjust enrichment.

**E.  Statute of limitations (Counts 1-4, 10)**

In Count 10 of their Second Amended Complaint, Plaintiffs
seek to recover under their federal tariffs, alleging
specifically that "Defendants' refusal to pay [them] according to
the terms of their valid FCC Tariffs constitutes unjust,

unreasonable, and unlawful self-help in violation of 47 U.S.C. § 201(b)."  Second. Am. Compl., ¶ 108.  Plaintiffs also allege that their federal access tariffs constitute contracts, and allege in Counts 1 through 4 that Defendants breached those contracts by failing to pay access charges.  Second Am. Compl., ¶¶ 32-57. Defendants move to dismiss Plaintiffs' federal claims to the extent they seek recovery for traffic delivered more than two years before service of Complaint, on the basis that such claims are barred by the two year statute of limitations set forth in 47 U.S.C. § 415(a).  That statute provides that "[a]ll actions at law by carriers for recovery of their lawful charges, or any part thereof, shall be begun within two years from the time the cause of action accrues, and not after."

Defendants maintain that a claim for failure to pay for terminating traffic accrues when the call is delivered, and that Plaintiffs' federal claims are thus barred to the extent they seek compensation for traffic exchanged more than two years before service of the Complaint in this case.  Plaintiffs, in contrast, assert that a federal claim based on interstate tariffs accrues on the date the bills became due, not when the calls were made.

Some courts have indeed concluded that a claim accrues for purposes of Section 415(a) on the date that bills for access services become due, rather than on the date the services were rendered.  *See, MCI Telecommunications v. Teleconcepts,* 71 F.3d

FINDINGS AND RECOMMENDATION/ Page 36

1086, 1098-1101 (3ʳᵈ Cir. 1995); *Central Scott Tel. Co., v. Teleconnect Long Distance Servs. & Sys. Co.*, 832 F.Supp. 1317, 1320(S.D. Iowa).

This does not mean, however, that Plaintiffs could effectively prevent their claims from accruing, and the statute from running, by not billing the Defendants for services previously rendered.  As the same courts have concomitantly recognized, "[t]he purpose of Section 415 is to protect a potential defendant against stale and vexatious claims by ending the possibility of litigation after a reasonable period of time has elapsed." *Central Scott Tel.*, 832 F.Supp. at 1320.  Accordingly, "the statute of limitations for purposes of § 415(a) accrues with the discovery of the right or wrong or of the facts on which such knowledge is chargeable in law." *MCI Telecommunications*, 71 F.3d at 1100.  *See also, Commc'ns Vending Corp. Of Ariz., Inc. v. FCC*, 365 F.3d 10654, 1074 (D.C. Cir. 2004) (stating that under the "discovery of injury" rule which applies for purposes of Section 415, a "cause of action accrues either when a readily discoverable injury occurs or, if an injury is not readily discoverable, when the plaintiff should have discovered it.")

Here, Plaintiffs alleged in their original Complaint that they first began sending invoices to Defendants in April 2005.  Complaint, ¶¶ 58, 68, 79, 89.  They have since amended their Complaint to omit any reference to the date upon which they first

FINDINGS AND RECOMMENDATION/ Page 37

billed Defendants.  *See,* Second Am. Compl.  It is nonetheless
clear that they seek to recover charges for traffic delivered
from November 16, 1998, to the present.  Second Am. Compl., ¶¶
34, 39, 44, 50.  This Court cannot determine from the
allegations in the Second Amended Complaint, exactly when
Plaintiffs first knew or should have known that Defendants would
not compensate them for terminating wireless traffic on their
networks.  Defendants' motion to dismiss the federal portions of
Counts 1 though 4, as well as Count 10, as to traffic delivered
before June 19, 2004, should thus be denied.

### F.  Attorneys' fees

Plaintiffs have also amended their Complaint to add a claim
for attorneys fees pursuant to the terms of their state access
tariffs.  Second Am. Compl., ¶¶ 110-114.  As discussed at length
above, however, federal law impliedly preempts Plaintiffs' state
law tariff claims.  Because Plaintiffs cannot recover under their
state access tariffs, it stands to reason that they cannot pursue
attorneys fees under those tariffs either.